IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Tracy Worthy, | ) | C/A No.: 1:15-3555-MBS-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On August 10, 2011, Plaintiff protectively filed an application for DIB in which she alleged her disability began on March 18, 2010. Tr. at 149–52. Her application was denied initially and upon reconsideration. Tr. at 136–39, 141–42. On September 23,

2013, Plaintiff had a hearing before Administrative Law Judge ("ALJ") John S. Lamb. Tr. at 32–74 (Hr'g Tr.). The ALJ issued an unfavorable decision on March 14, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 11–31. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–5. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on September 4, 2015. [ECF No. 1].

    B.    Plaintiff's Background and Medical History

        1.    Background

Plaintiff was 46 years old on her date last insured ("DLI") for DIB.[1] Tr. at 39. She completed the eleventh grade and obtained a certificate in cosmetology. *Id.* Her past relevant work ("PRW") was as a cosmetologist, a veterinary assistant, a filter assembler, and a deli worker. Tr. at 62. She alleges she has been unable to work since March 18, 2010.[2] Tr. at 35.

---

[1] According to the Social Security Administration's ("SSA's") Program Operations Manual System ("POMS"), the DLI is "the last day in the last quarter when disability insured status is met." POMS RS 00301.148. Individuals over age 31 must have at least 20 quarters of coverage over a 40-quarter period, ending with the quarter in which the waiting period begins to be insured for DIB. POMS RS 00301.120.

[2] Plaintiff alleged her disability commenced on this date because it was the day after the ALJ denied benefits in a prior claim. Tr. at 35; *see also* Tr. at 102–17 (unfavorable decision dated March 17, 2010).

2.     Medical History

A spirometry report dated December 9, 2009, indicated Plaintiff had severe pulmonary obstruction. Tr. at 244. A chest x-ray revealed no significant abnormality, but noted degenerative spurs in Plaintiff's lumbar spine. Tr. at 245.

On January 4, 2010, Plaintiff presented to neurologist John Absher, M.D. ("Dr. Absher"), for nerve conduction studies ("NCS"). She complained pain in her bilateral lower extremities that had been ongoing for over a year and that increased after walking and during the night. Tr. at 241. She also endorsed occasional numbness and tingling in her bilateral feet, frequent cramps in her calf muscles, and low back pain with radiating symptoms into her bilateral lower extremities. *Id.* Dr. Absher reported the NCS were normal. Tr. at 242.

Plaintiff presented to Michael Zeager, M.D. ("Dr. Zeager"), on January 8, 2010, and reported a marked increase in bilateral lower extremity pain. Tr. at 233. She stated her chronic bronchitis had improved. *Id.* Dr. Zeager observed Plaintiff to have tender lumbar spinous processes; tenderness to palpation in her hamstrings, quadriceps, and calves; and decreased Achilles reflexes bilaterally. *Id.* He assessed sciatica and worsening myalgia/myositis. *Id.* He prescribed 200 milligrams of Lyrica and 50 milligrams of Savella, each to be taken twice a day. Tr. at 233–34.

On January 11, 2010, Dr. Zeager wrote that he had treated Plaintiff for fibromyalgia and depression and described Plaintiff's treatment history and limitations. Tr. at 232.

3

On January 15, 2010, Plaintiff reported to Dr. Zeager that she had started experiencing syncopal episodes one month earlier and had three episodes over the last week. Tr. at 231. She described weakness and feeling "weird" before losing consciousness. *Id.* She indicated the episodes had occurred while she was standing, walking, and sitting and had lasted for as long as 10 minutes. *Id.* Dr. Zeager prescribed a Holter monitor and decreased Plaintiff's dosage of Savella from 100 milligrams to 50 milligrams. *Id.* The Holter monitor showed sinus tachycardia. Tr. at 236.

Plaintiff presented to Dr. Absher on February 3, 2010, for electromyography ("EMG"). Tr. at 229. She complained of pain in her bilateral legs and indicated she had difficulty sleeping because she could not keep her legs still at night. *Id.* Dr. Absher indicated the EMG of Plaintiff's right leg was normal and that she may benefit from treatment for restless leg syndrome. *Id.*

Plaintiff followed up with Dr. Zeager on February 8, 2010, to discuss recent test results. Tr. at 227. Dr. Zeager indicated that Plaintiff's depression was unchanged and that she experienced anxiety, but noted she was presently off all medications. *Id.* He stated Plaintiff's recent EMG and NCS were normal. *Id.* He noted that a neurologist prescribed Mirapex for Plaintiff's complaint of sciatica, but that she discontinued the medication because it caused nausea and vomiting. *Id.* Dr. Zeager observed Plaintiff to have trapezius tenderness and decreased Achilles reflexes bilaterally, but noted no other abnormalities on examination. *Id.* He prescribed Alprazolam for her depression and Savella, Lyrica, and Nortriptyline for myalgia/myositis. Tr. at 227–28.

On March 31, 2010, Plaintiff indicated to Dr. Zeager that she did well with her current medication regimen for myalgia/myositis, but that she required an average of six to eight Lortab daily to control her pain. Tr. at 225. Dr. Zeager observed Plaintiff to have tenderness in her trapezius and lumbar muscles. *Id.* He discontinued Plaintiff's prescription for Lortab and prescribed Hydrocodone-Acetaminophen ("Norco") 10-325 milligrams. *Id.* He dispensed 180 pills and instructed Plaintiff to take one to two tablets every four to six hours. *Id.*

Plaintiff reported stable back pain on May 18, 2010. Tr. at 223. She complained of chronic fatigue, cramping in the soles of her feet, and ongoing numbness, tingling, and cramping in her legs. *Id.* She indicated her leg and foot pain was unimproved with Nortriptyline. *Id.* Dr. Zeager observed Plaintiff to demonstrate tenderness in her trapezius muscles, but to have normal range of motion ("ROM"), stability, tone, sensation, and strength. *Id.* He diagnosed vitamin D deficiency and prescribed 25 milligrams of Nortriptyline for limb pain. *Id.*

On June 10, 2010, Plaintiff reported to Dr. Zeager that she had recently fainted after experiencing a coughing spell. Tr. at 219. Dr. Zeager noted that an electrocardiogram ("EKG") was normal. Tr. at 220. He prescribed medication for Plaintiff's cough and nasal congestion. *Id.*

On September 30, 2010, Plaintiff presented to Dr. Zeager with a cough and other upper respiratory symptoms that began three days earlier. Tr. at 216. Dr. Zeager diagnosed sinusitis and bronchitis, prescribed medications, and instructed Plaintiff to follow up in two weeks if her symptoms persisted. Tr. at 216–17. Plaintiff followed up

5

with Dr. Zeager for medication refills on October 15, 2010. Tr. at 214. Dr. Zeager diagnosed sinusitis and bronchitis and administered a flu vaccine. *Id.*

On January 14, 2011, Plaintiff reported to Dr. Zeager that she had recently experienced an episode of syncope, after returning from a grocery shopping trip and attempting to walk around her car. Tr. at 211. She indicated she had also experienced a brief period of syncope after coughing for an extended period. *Id.* She reported being disoriented for a few minutes after each episode. *Id.* Plaintiff complained of gradually worsening diffuse myalgia-related pain. *Id.* Dr. Zeager observed her to have some trapezius tenderness, but noted no other abnormalities. *Id.* He prescribed 50 milligrams of Savella and refilled Plaintiff's prescriptions for Hydrocodone-Acetaminophen 10-325 milligrams and Lyrica 200 milligrams. *Id.* He noted Plaintiff's EKG was normal and indicated that he suspected Plaintiff's syncope was related to vasodepressor and post-micturition etiologies. Tr. at 212.

Plaintiff presented to Dr. Zeager for medication refills on February 1, 2011. Tr. at 209. She reported numbness and tingling in her hands and feet and stated she had been dropping items since her last visit. *Id.* She complained of left lateral thigh pain and a sensation that her left lower extremity was "giving way." *Id.* Plaintiff endorsed anhedonia, anxiety, increased pain, and sleep disturbance. *Id.* Dr. Zeager observed trochanteric bursa tenderness in Plaintiff's left lower extremity, but noted no other abnormalities on examination. *Id.* He injected Plaintiff's left trochanteric bursa with a combination of Marcaine and Kenalog. *Id.* He reported Tinel's and Phalen's tests were negative in Plaintiff's bilateral wrists. *Id.* He described Plaintiff as having a mildly

6

depressed affect and noted that her depression and myalgia/myositis had worsened. *Id.* He prescribed Savella for myalgia/myositis. Tr. at 210.

On March 15, 2011, Plaintiff reported that her left hip pain had resolved after she received the injection at her last visit. Tr. at 207. She continued to report pain in her legs and numbness and occasional throbbing in her hands. *Id.* She indicated that over the past three weeks, she had experienced cycles in which she was unable to sleep for two to three days and then crashed for a day-and-a-half. *Id.* Dr. Zeager observed Plaintiff to have increased tone and tenderness in her bilateral trapezius muscles. *Id.* He prescribed Savella for myalgia/myositis, Nortriptyline and Citalopram for limb pain, and Zolpidem Tartrate for insomnia. Tr. at 208.

On March 30, 2011, Plaintiff complained of increased hip pain that was related to cool and wet weather over the past two months. Tr. at 205. She reported that her insomnia had improved with the addition of Nortriptyline, but that she continued to experience numbness and tingling in her extremities. *Id.* Dr. Zeager observed Plaintiff to have trochanteric bursa tenderness, but to have full ROM and normal stability in her hip. *Id.* He injected Plaintiff's hip with a combination of Marcaine and Kenalog. *Id.* He indicated Plaintiff's myalgia/myositis was improved and discontinued her prescription for Citalopram. Tr. at 205–06. He prescribed Pennsaid Transdermal Solution for bursitis and increased Plaintiff's dosage of Nortriptyline from 25 milligrams to 50 milligrams for insomnia. Tr. at 205–06.

Plaintiff reported numbness in her hands and feet, headaches, and swelling on April 26, 2011. Tr. at 203. She described a sudden onset of headache and dizziness after

7

dinner on April 24. *Id.* She indicated that she had improved with Savella, but continued to experience severe disabling pain diffusely over her back and in all four extremities. *Id.* Dr. Zeager noted that Plaintiff's current symptoms were likely the result of serotonergic syndrome that was related to Nortriptyline and worsening depression. *Id.* He assessed depressive disorder and referred Plaintiff for psychiatric treatment. *Id.* He discontinued Nortriptyline and prescribed Savella for paresthesias. Tr. at 203–04.

Plaintiff presented to psychiatrist Jeffrey Smith, M.D. ("Dr. Smith"), on May 4, 2011. Tr. at 258. She indicated that she had a history of depression and had been hospitalized at age 14, after being molested by her father and brother. *Id.* She reported symptoms that included depressed mood; decreased energy, motivation, and interest; difficulty concentrating; feelings of sadness and hopelessness; frequent crying spells; sleep loss/hypersomnolence; loss of libido; appetite changes with weight gain; social withdrawal; and inactivity. *Id.* Plaintiff indicated she was anxious, jittery, constantly worried, on edge, unable to relax, and overwhelmed. *Id.* She endorsed a history of panic attacks, but denied any recent attacks. *Id.* She stated she was easily angered, irritable, impulsive, and had racing thoughts. *Id.* Dr. Smith observed that Plaintiff's affect was "a bit flat" and that her mood was "a bit depressed and anhedonic." Tr. at 259. He described Plaintiff as pleasant during the interview and noted that she was not agitated; did not exhibit mania or psychosis; did not endorse suicidal or homicidal ideations; had no gross cognitive deficits; had normal concentration and focus; had average insight and judgment; demonstrated normal gait, dress, hygiene, and speech; had local thought processes; and was goal-oriented toward treatment. *Id.* He assessed type II bipolar

disorder and fibromyalgia. *Id.* He discontinued Celexa and Nortriptyline and prescribed Seroquel for mood and sleep. *Id.*

On May 26, 2011, Plaintiff presented to Joseph Friddle, P.A. ("Mr. Friddle"), who was supervised by Dr. Smith. Tr. at 261. She reported that her sleep had improved and that she had noticed mild improvement in her mood and irritability. *Id.* She continued to endorse chronic pain and stated she was concerned about her lack of energy and weight gain. *Id.* Mr. Friddle noted that Plaintiff's affect was brighter and that her mood was more euthymic, but that she still appeared "a bit fatigued." *Id.* He increased Seroquel to 200 milligrams, prescribed Phentermine for energy and weight loss, and instructed Plaintiff to continue her other medications. *Id.*

Plaintiff reported to Rhett McCraw, M.D. ("Dr. McCraw"), on May 31, 2011, for possible sleep apnea. Tr. at 256. She indicated that she felt drowsy while watching television and often struggled to stay awake. *Id.* She indicated she had fallen asleep in church. *Id.* She stated she awoke frequently during the night and had difficulty falling asleep and going back to sleep after being awakened. *Id.* Dr. McCraw assessed obstructive sleep apnea and insomnia. Tr. at 257.

On June 22, 2011, Dr. McCraw indicated that the sleep study revealed mild sleep apnea. Tr. at 254. He ordered an auto-titrating CPAP machine and recommended Plaintiff follow up in a few weeks to discuss her use of the CPAP machine. *Id.*

On June 23, 2011, Plaintiff reported to Mr. Friddle that she had difficulty initiating sleep; was irritable and agitated; and experienced low energy and fatigue during the day. Tr. at 262. Mr. Friddle observed that Plaintiff appeared frustrated and fatigued and was

more anhedonic. *Id.* He discontinued Phentermine and Savella, added Pristiq for depression, and continued Plaintiff's other medications. *Id.*

On June 28, 2011, Plaintiff complained to Dr. Zeager that the pain in her lateral hips and legs had returned. Tr. at 201. She also reported some paresthesias in her hands, after switching from Savella to Pristiq. *Id.* Dr. Zeager noted that Plaintiff was moderately obese and had gained three pounds since her last visit. *Id.* He observed Plaintiff to have tenderness and increased tone in her trapezius muscles. *Id.* He also noted trochanteric bursa tenderness. *Id.* Plaintiff's examination was otherwise normal. *Id.* Dr. Zeager assessed hip bursitis and myalgia/myositis. *Id.* He discontinued Pennsaid Transdermal Solution, prescribed Meloxicam, and refilled Lyrica and Hydrocodone. Tr. at 201–02.

On July 14, 2011, Plaintiff reported that her sleep had improved, after she started CPAP for sleep apnea and that her mood and energy had improved on Pristiq. Tr. at 263. Mr. Friddle noted that Plaintiff still appeared "a bit fatigued," but had a brighter affect and a euthymic mood. *Id.* He continued Plaintiff's medications. *Id.*

On August 4, 2011, Plaintiff reported to Dr. McCraw that she was sleeping better and feeling more energetic during the day. Tr. at 251. She indicated she was pleased with the improvement in her sleep and desired to continue using the CPAP machine. *Id.*

Plaintiff reported being under more stress and experiencing interrupted sleep on August 25, 2011. Tr. at 264. She stated she was caring for her daughter and granddaughter because her daughter had experienced pregnancy-related complications. *Id.* Plaintiff endorsed increased joint and fibromyalgia-related pain since stopping Savella and requested that she be allowed to resume the medication. *Id.* Mr. Friddle noted that

Plaintiff had a bright affect, a euthymic mood, was in good spirits, and was coping with stress well, but still appeared a bit fatigued. *Id.* He prescribed Savella and continued Plaintiff's other medications. *Id.*

On August 25, 2011, Plaintiff indicated to Dr. Zeager that her chronic fatigue had not improved on her current medication regimen. Tr. at 300. She informed him that her blood pressure was 90/50 in the pulmonologist's office. *Id.* Dr. Zeager noted Plaintiff's insomnia and chronic bronchitis were improved and her myalgia/myositis was stable on her current regimen. *Id.* He indicated Plaintiff had gained eight pounds since her last visit. *Id.* He observed Plaintiff to have 2+ tenderness over the trapezius and paraspinous muscles without appreciable spasm, but noted no other abnormalities on examination. *Id.*

On September 8, 2011, state agency consultant Seham El-Ibiary ("Dr. El-Ibiary"), reviewed the record and assessed Plaintiff's physical impairments as nonsevere. Tr. at 122–23. Dale Van Slooten, M.D. ("Dr. Van Slooten"), similarly assessed Plaintiff's physical impairments as nonsevere on October 31, 2011. Tr. at 131.

On September 9, 2011, state agency medical consultant Xanthia Harkness, Ph. D. ("Dr. Harkness"), reviewed the record and completed a psychiatric review technique form ("PRTF"). Tr. at 123. Dr. Harkness considering Listing 12.04 for affective disorders, but found that there was insufficient evidence "to substantiate the presence of a disorder" or to rate Plaintiff's restrictions in activities of daily living ("ADLs"), social functioning, or concentration, persistence, or pace. *Id.* She stated "[t]he allegation of manic depression appears to be somewhat credible," but noted she could not make a medical decision because "there is no function information at the DLI." *Id.* Martha

Durham, Ph. D. ("Dr. Durham"), reached the same conclusion on October 31, 2011. Tr. at 132.

Plaintiff reported increased frequency of lightheadedness with changes of position, brief palpitations, shortness of breath, fatigue, and poor exercise tolerance on September 15, 2011. Tr. at 297. Dr. Zeager referred Plaintiff for lab work. *Id.*

On November 14, 2011, Plaintiff complained of being frustrated by her inability to do things she used to do. Tr. at 278. She reported increased stress and interrupted sleep. *Id.* Mr. Friddle described Plaintiff as having a bright affect and euthymic mood. *Id.* However, he increased Pristiq to 100 milligrams for depression. *Id.*

On November 21, 2011, Plaintiff complained of acute lumbar pain. Tr. at 294. She indicated the pain was worse with deep breaths and trunk ROM. *Id.* Plaintiff's gait was slow, cautious, and stiff. *Id.* Michael S. Atkinson, M.D. ("Dr. Atkinson"), observed Plaintiff to be tender to palpation over the left upper to midlumbar lumbosacral paraspinous muscles. Tr. at 293. He indicated Plaintiff experienced discomfort on general trunk ROM testing, but had normal strength and tone. *Id.* Dr. Atkinson diagnosed a sprain/strain and prescribed Tizanidine HCl. *Id.*

Plaintiff reported being under more stress on December 12, 2011. Tr. at 277. She endorsed interrupted sleep and stated she was caring for her daughter and granddaughter. *Id.* Mr. Friddle described Plaintiff's mood as "fairly stable and euthymic." *Id.* Plaintiff reported being less emotional and having slightly more energy since her dosage of Pristiq was increased. *Id.*

Dr. Zeager described Plaintiff's bipolar affective disorder, myalgia/myositis, and palpitations as well-controlled on May 7, 2012. Tr. at 292. However, he noted Plaintiff continued to have some hand tremors that were not completely controlled on the medication. *Id.* He described Plaintiff's gait as slow, cautious, and stiff. *Id.* Dr. Zeager observed no abnormalities on examination and described Plaintiff's mood and affect as normal. *Id.*

On June 16, 2012, Plaintiff reported worsened mood as a result of family stressors. Tr. at 276. She indicated she was taking 200 milligrams of Seroquel XR instead of 300 milligrams and was unable to take Xanax because of its sedative effect. *Id.* She stated she was more irritable, agitated, and obsessive. *Id.* Mr. Friddle discontinued Xanax and prescribed Ativan. *Id.*

Plaintiff complained to Dr. Zeager of blood pressure problems on July 2, 2012. Tr. at 291. She indicated she was experiencing dizzy spells and numbness in her hands and feet. *Id.* She stated she had difficulty breathing outdoors and had noticed lightheadedness when changing positions. *Id.* Dr. Zeager observed that Plaintiff ambulated with a slow, cautious, and stiff gait. *Id.* He described her mood and affect as normal. *Id.*

Plaintiff complained of sweats, swelling, chest pain, low blood pressure, and fainting spells on July 16, 2012. Tr. at 290. Dr. Zeager described Plaintiff's gait as slow, cautious, and stiff. *Id.* He assessed orthostatic hypotension and referred Plaintiff to a cardiologist. *Id.*

On July 20, 2012, an echocardiograph ("echo") showed moderate aortic regurgitation, but no other abnormalities. Tr. at 268. On July 24, 2012, stress myocardial

perfusion imaging was normal. Tr. at 269. Plaintiff underwent a carotid ultrasound on July 26, 2012, after reporting dizziness. Tr. at 266. The ultrasound revealed normal antegrade flow in the bilateral vertebral arteries, luminal plaque with no significant disease in the bilateral proximal internal carotid arteries, and questionable mild enlargement of the thyroid gland with a possible nodule. *Id.*

On August 13, 2012, Plaintiff reported her mood had worsened as a result of family stressors and that she had difficulty initiating sleep and was feeling fatigued during the day. Tr. at 275. Mr. Friddle observed Plaintiff to have a bright affect, a euthymic mood, logical thoughts, and to be coping well with stress. *Id.* He discontinued Seroquel XR, prescribed Seroquel IR, and continued Plaintiff's other medications. *Id.*

On September 26, 2012, Dr. Zeager noted that Plaintiff's gait was slow, cautious, and stiff. Tr. at 289. He observed her to have positive Tinel's and Phalen's tests to her bilateral wrists. *Id.* He diagnosed carpal tunnel syndrome and prescribed bilateral wrist splints. *Id.*

Plaintiff complained of leg cramps that were interfering with sleep on November 1, 2012. Tr. at 284. Dr. Zeager observed tenderness over Plaintiff's left trochanter and administered an injection of Marcaine and Kenalog. *Id.* He indicated that the nodule noted on the carotid ultrasound was not visible on the thyroid ultrasound. Tr. at 285. He referred Plaintiff for a comprehensive metabolic panel and a test for thyroid stimulating hormone ("TSH"). *Id.* The comprehensive metabolic panel indicated Plaintiff's creatinine was high, but the TSH test was normal. Tr. at 286, 287.

On November 12, 2012, Mr. Friddle noted that Plaintiff was doing better on Seroquel IR and Ativan. Tr. at 274. Plaintiff reported sleeping well, being less fatigued during the day, and feeling less irritable and agitated. *Id.*

On February 11, 2013, Plaintiff complained to Mr. Friddle of increased sadness following her uncle's death. Tr. at 308. She endorsed crying spells and sadness, but denied anxiety, depression, anhedonia, difficulty concentrating, and sleep disturbance. *Id.* Mr. Friddle indicated Plaintiff's affect was bright and her mood was euthymic. *Id.* He noted no impairment to orientation, memory, concentration, focus, judgment, insight, speech, or thought process. *Id.*

Dr. Zeager provided a second medical opinion statement on March 4, 2013. Tr. at 281. On March 21, 2013, Plaintiff reported her bipolar disorder was generally well-controlled, but that she became agitated easily and experienced periods of agitation for one to two days at a time that occurred approximately twice a week. Tr. at 318. She stated her back pain was well-controlled, but complained of increased pain in her legs. *Id.* She complained of a strange sensation in her abdomen. *Id.* Dr. Zeager described Plaintiff's gait as slow, cautious, and stiff. *Id.* He referred her for an evaluation for a possible pelvic mass. *Id.* On April 8, 2013, Plaintiff indicated to Dr. Zeager that she had constant pain and that her muscle tenderness had worsened. Tr. at 314. She reported urinary incontinence and stated she often awakened at night to discover that she had wet her bed. *Id.* Dr. Zeager described Plaintiff's gait as slow, cautious, and stiff. *Id.* He observed her to have diffuse tenderness without spasm over her trapezius, upper arms, and upper thighs. *Id.* He prescribed Lyrica and referred Plaintiff to a urologist. *Id.*

Plaintiff was upset, anxious, and tearful when she presented to Mr. Friddle on April 17, 2013. Tr. at 320. She reported that her 30-year-old daughter, the daughter's boyfriend, and the daughter's child were all living with her. *Id.* She indicated she was overwhelmed by the situation and was having difficulty coping with the stress. *Id.* She endorsed symptoms that included anxiety, crying spells, depression, feelings of stress, sadness, and sleep disturbance. *Id.* Mr. Friddle observed that Plaintiff had a depressed affect, an upset mood, and was anxious, tearful, and on edge. *Id.* He indicated Plaintiff had logical thought processes, intact memory, and average judgment and insight, but that her concentration and focus were scattered. *Id.* He increased her Ativan to two milligrams twice a day, as needed for anxiety. *Id.* On May 14, 2013, Plaintiff informed Mr. Friddle that she had recently informed her daughter that she would need to move out of the house. Tr. at 310. Plaintiff reported anxiety, crying spells, depression, feelings of stress, sadness, and sleep disturbance, but denied anhedonia and difficulty concentrating. *Id.* Mr. Friddle observed that Plaintiff had a depressed affect and an upset mood, but was less anxious and was not tearful. *Id.* He indicated Plaintiff had average insight and judgment, intact memory, and logical thought processes, but that her concentration and focus were scattered. *Id.*

Plaintiff presented to Palmetto Greenville Urology on April 19, 2013. Tr. at 334–36. L. Allyson Curry, ANP, diagnosed cystocele vaginal wall prolapse and urinary incontinence. Tr. at 336. Plaintiff subsequent underwent a urodynamic study that indicated she had stress urinary incontinence. Tr. at 331–33.

On May 15, 2013, Dr. Zeager noted that Plaintiff's fibromyalgia-related pain was improved on her current regimen, but that she continued to have difficulty getting to sleep because of pain in her lower extremities. Tr. at 313. He observed Plaintiff to have a slow, cautious, and stiff gait and 2+ edema in her bilateral lower extremities. *Id.* He prescribed Ropinirole for restless leg syndrome. *Id.*

Mr. Friddle completed a medical source opinion statement on August 5, 2013. Tr. at 337–38. On August 13, 2013, Plaintiff reported to Mr. Friddle that she was stressed out, anxious, on edge, more irritable and agitated, and had difficulty coping with even minimal stress. Tr. at 339. She endorsed anxiety, crying spells, depression, feelings of stress, sadness, and sleep disturbance. *Id.* Mr. Friddle observed Plaintiff to have a depressed affect, an upset mood, and to be anxious. *Id.* Plaintiff was not tearful, but her concentration and focus were scattered. *Id.* Mr. Friddle decreased Plaintiff's dosage of Pristiq and added Viibryd. *Id.*

Dr. Zeager attempted to clarify his earlier statements in a medical opinion statement dated October 22, 2013, which is detailed below. Tr. at 340.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on September 23, 2013, Plaintiff testified that she had fibromyalgia and that her symptoms increased in severity between March and June 2010. Tr. at 40. She stated her skin was sore and felt like it was on fire. *Id.* She testified it was difficult for her to put on her clothes on some days. *Id.* She indicated her medications provided some

relief, but did not take away her pain. Tr. at 41. She stated she had bursitis, which was worse on the left than on the right. *Id.* She indicated her doctor had administered cortisone injections, but had not recommended surgery. *Id.* Plaintiff rated her pain as an eight to nine on a 10-point scale. *Id.* She stated she sometimes experienced numbness in her hands that caused her to drop items. Tr. at 42. She indicated she had severe COPD. Tr. at 44. She endorsed difficulty sleeping. Tr. at 48. She stated she sometimes had coughing spells and dizzy spells that caused her to pass out. Tr. at 49.

Plaintiff testified she received mental health treatment from Mr. Friddle. Tr. at 42. She stated she had seen Mr. Friddle for over a year and had previously seen Dr. Zeager for mental health treatment. Tr. at 42–43. She indicated she had been diagnosed with depression, anxiety, and bipolar disorder. Tr. at 46–47. She stated her mental symptoms had gradually worsened over time. Tr. at 56.

Plaintiff testified that she lived with her husband and her adult daughter. Tr. at 48. She stated her daughter did the majority of the household chores. *Id.* She indicated that taking a shower caused her to become exhausted. *Id.*

Plaintiff testified she would be unable to perform a simple, repetitive job because she would be unable to remain on task. Tr. at 54. She stated she attempted to perform small tasks at home, but typically quit before she completed them. Tr. at 55. She indicated she could perform a task for an hour to an hour-and-a-half at a time. *Id.* She stated she felt hot, had difficulty breathing, started coughing, and became exhausted when she attempted to perform household chores. Tr. at 56. She testified that she would be unable to concentrate on a task for eight hours. Tr. at 57. She indicated she was

sometimes unable to focus for long enough to watch a television show. *Id.* She stated that her ability to concentrate had worsened over the years. Tr. at 58.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Robert E. Brabham, Sr., Ph. D., reviewed the record and testified at the hearing. Tr. at 60–70. The VE categorized Plaintiff's PRW as a cosmetologist as light with a specific vocational preparation ("SVP") of six; a veterinary assistant as medium with an SVP of four; a filter assembler as light with an SVP of two; and a deli worker as light with an SVP of two. Tr. at 61–62. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform work at the light exertional level that required no climbing of ladders, ropes, or scaffolds; only occasional climbing of ramps or stairs; occasionally stooping, balancing, crawling, or crouching; no concentrated exposure to hazards, dust, fumes, odors, gases, and pulmonary irritants; and was limited to simple, routine, repetitive tasks with no ongoing public contact and low stress, defined as a only occasional change in work setting or decision making. Tr. at 62–63. The VE testified that the hypothetical individual could perform Plaintiff's PRW as a filter assembler, *Dictionary of Occupational Titles* ("*DOT*") number 739.687-026. Tr. at 64. The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified light jobs with an SVP of two as a hand packager, *DOT* number 726.687-038, with 10,000 positions in South Carolina and 400,000 positions in the national economy; a production inspector, *DOT* number 361.687-022, with 5,000 positions in South Carolina and 200,000 positions in the national economy; and a machine tender, *DOT* number

689.685-130, with 4,000 positions in South Carolina and 160,000 positions nationally. Tr. at 65–66.

The ALJ next described a hypothetical individual of Plaintiff's vocational profile who was limited as described in the first hypothetical, but was restricted to sedentary instead of light work. Tr. at 66. He asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. Tr. at 67. The VE testified that the individual could perform sedentary jobs with an SVP of two as an assembler, *DOT* number 732.684-062, with 2,000 positions in South Carolina and 80,000 positions in the national economy; a packer, *DOT* number 589.687-014, with 5,000 positions in South Carolina and 200,000 positions nationally; and surveillance monitor, *DOT* number 379.367-010, with 1,000 positions in South Carolina and 40,000 positions nationally. Tr. at 67–68.

The ALJ asked the VE to assume the hypothetical individual would miss one day of work per week. Tr. at 68. He asked whether that limitation would preclude all forms of work activity. *Id.* The VE indicated it would. *Id.* He further stated that the limitations Plaintiff endorsed in her testimony would preclude all work. *Id.*

Plaintiff's attorney described a hypothetical individual of Plaintiff's vocational profile and asked the VE to assume the individual could only deal with ordinary work stresses 40% of the time and could only maintain attention and concentration 40% of the time. Tr. at 69. The VE indicated the individual would be unable to perform any work. *Id.* Plaintiff's attorney asked the VE to assume the individual could only remember and carry out simple job instructions 80% of the time. *Id.* The VE stated there would be no jobs the

individual could perform. *Id.* Plaintiff's attorney asked the VE to assume the hypothetical

individual would be unable to maintain a low stress, sedentary job for eight hours per day

and 40 hours per week. Tr. at 70. The VE responded that the individual would be unable

to engage in competitive employment. *Id.*

2.    The ALJ's Findings

In his decision dated March 14, 2014, the ALJ made the following findings of fact

and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security
      Act on June 30, 2010.
2.    The claimant did not engage in substantial gainful activity during the period
      from her alleged onset date of March 18, 2010 through her date last insured
      of June 30, 2010 (20 CFR 404.1571 et seq.).
3.    Through the date last insured, the claimant had the following severe
      impairments: fibromyalgia, bursitis of hips, depression, and anxiety (20
      CFR 404.1520(c)).
4.    The claimant does not have an impairment or combination of impairments
      that meets or medically equals the severity of one of the listed impairments
      in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d),
      404.1525 and 404.1526).
5.    After careful consideration of the entire record, the undersigned finds that,
      through the date last insured, the claimant had the residual functional
      capacity to perform light work as defined in 20 CFR 404.1567(b) except
      light work, never use of [sic] ladders, ropes, or scaffolds, occasional use of
      ramps, stairs, and occasional stooping, balancing, crawling, and couching,
      the claimant must avoid concentrated exposure to hazards and avoid
      concentrated exposure to dust, fumes, odors, gases or pulmonary irritants.
      The claimant would be limited to simple, routine and repetitive tasks with
      no ongoing public contact and low stress defined as only occasional change
      in work setting or decision-making. In the alternative, the same RFC but at
      sedentary.
6.    Through the date last insured, the claimant was unable to perform any past
      relevant work (20 CFR 404.1565).
7.    The claimant was born on May 26, 1964 and was 46 years old, which is
      defined as a younger individual age 18–49, on the date last insured (20 CFR
      404.1563).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from March 18, 2010, the alleged onset date, through June 30, 2010, the date last insured (20 CFR 404.1520(g)).

Tr. at 16–27.

II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)      the ALJ did not appropriately evaluate the medical opinion evidence of record; and

2)      the ALJ relied on a hypothetical to the VE that did not set forth all of Plaintiff's impairments and limitations.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

22

expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings

of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Evaluation of Medical Opinions

Plaintiff argues the ALJ did not adequately evaluate the opinions of her treating physician Dr. Zeager and her treating physician's assistant Mr. Friddle. [ECF No. 10 at

22]. She maintains the ALJ erred in giving greater weight to the opinions of the state agency consultants than the opinions of the treating medical providers. *Id.* at 34.

The Commissioner argues the ALJ adequately weighed the medical evidence of record and that substantial evidence supports his evaluation of the opinion evidence. [ECF No. 11 at 8–12].

ALJs must consider all medical opinions in the record. 20 C.F.R. § 404.1527(b). Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." SSR 96-5p, quoting 20 C.F.R. § 404.1527(a). Acceptable medical sources include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. SSR 06-p; 20 C.F.R. § 404.1513(a). "Other sources" include medical and psychological providers, such as nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists, as well as non-medical sources, such as educational personnel, social welfare agency personnel, rehabilitation counselors, spouses, other relatives, friends, neighbors, clergy, and former co-workers and employers. 20 C.F.R. § 404.1513(d).

It is not the role of this court to disturb the ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir.

1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

In view of the foregoing authority, the undersigned addresses Plaintiff's specific allegations of error.

### a.    Dr. Zeager's Opinion

On January 11, 2010, Dr. Zeager explained that he treated Plaintiff for fibromyalgia and depression. Tr. at 232. He described Plaintiff as having one of the more severe cases of fibromyalgia of any of his patients and noted that she was the only one of his patients who took both Lyrica and Savella. *Id.* He acknowledged that he did not check all of Plaintiff's fibromyalgia trigger points during each visit, but noted that he regularly found Plaintiff to have positive upper body trigger points. *Id.* He stated he could feel the tenseness of Plaintiff's muscles and indicated that it would be impossible for Plaintiff to feign such a sign. *Id.* He noted that Plaintiff described "fatigue and increasing function with mild exercise," which were consistent with a diagnosis of fibromyalgia. *Id.* He stated Lyrica and Savella had improved Plaintiff's functioning, but that she continued to require narcotic pain medications. *Id.* Dr. Zeager indicated that Plaintiff's level of functioning had deteriorated over the years and had required that she stop working because she was unable to persist at any activity for very long. *Id.* He stated Plaintiff became fatigued when standing more than briefly, sitting, or using her arms. *Id.* He indicated Plaintiff would require rest for at least several hours during an eight-hour period. *Id.* He stated he had discontinued Plaintiff's antidepressant medication when he prescribed Lyrica and Savella because they had antidepressant properties. *Id.* However,

he noted that he had to put Plaintiff back on an antidepressant because Lyrica and Savella were not sufficient to control her depressive symptoms. *Id.* Dr. Zeager noted that Plaintiff's depression imposed some limitations, but that fibromyalgia was a "more limiting problem." *Id.* He indicated Plaintiff had been very cooperative with treatment; had used her medications cautiously; and had continued several medications despite significant side effects. *Id.*

Dr. Zeager wrote a second statement on March 4, 2013. Tr. at 281. He stated that he had served as Plaintiff's primary care physician since at least 1999. *Id.* He indicated Plaintiff had diagnoses of fibromyalgia and bipolar disorder. *Id.* He explained that Plaintiff's fibromyalgia was coded as "myalgia" in his office notes because the computer program he used coded "myalgia" and "fibromyalgia" in the same way. *Id.* He indicated Plaintiff suffered from chronic, widespread pain in all four quadrants of her upper and lower body. *Id.* He noted that Plaintiff experienced the most pain in her legs and trapezius muscles. *Id.* He stated that Plaintiff was evidently in pain because she walked slowly and deliberately and had increased tone and tenderness to palpation in her trapezius muscles. *Id.* He described Plaintiff as dysphoric because of her chronic pain and mental health issues. *Id.* He indicated she was easily distractible and had difficulty making decisions. *Id.* He stated Plaintiff had difficulty relating her history and often presented as fatigued. *Id.* He indicated Plaintiff's mental limitations likely resulted from sleep disturbance that was a symptom of both fibromyalgia and depression. *Id.* Dr. Zeager indicated Plaintiff's pain had been well-controlled since November 2011, but explained that he meant they had "done as much as we can to make her more comfortable but she still suffers from the

28

symptoms I have described above." *Id.* He explained that Plaintiff was diagnosed with fibromyalgia in 2001 and continued to work for as long as she could do so. *Id.* He stated that Plaintiff presented to his office after resting at home and would have increased pain if she were working. *Id.* He indicated that Plaintiff would experience increased muscle tightness and sleep disturbance if she were working, and that these symptoms would result in absenteeism. *Id.* He stated Plaintiff could not perform a low-stress, sedentary job for eight hours per day and 40 hours per week. *Id.* Finally, he indicated Plaintiff was further limited as a result of sleep apnea, frequent bronchitis, and underlying asthma. *Id.*

On October 22, 2013, Dr. Zeager provided a third medical opinion statement.[5] Tr. at 340. He clarified that Plaintiff had been suffering with serious mental issues for a substantial period before a psychiatrist formally diagnosed her with bipolar disorder. Tr. at 340. He indicated Plaintiff had reported syncope in January 2010 and again in June 2010 that was likely caused by anxiety. *Id.* He indicated Plaintiff was suffering from debilitating symptoms of bipolar disorder at the time of the syncopal episodes. *Id.* He stated he first prescribed Lyrica to Plaintiff in December 2009, when she reported a stabbing pain in her bilateral legs. *Id.* He indicated Plaintiff worked for as long as she was able, but that her mental health issues became severe enough to interfere with her daily life and prevented her from working around January 2010. *Id.*

---

[5] The record reflects that Dr. Zeager's third opinion statement was transcribed based on a telephone conversation between Dr. Zeager and Plaintiff's attorney. *See* Tr. at 341. Plaintiff's attorney requested that Dr. Zeager review the statement for accuracy, sign it, make necessary corrections, and return it. *Id.*

Plaintiff argues the ALJ did not consider Dr. Zeager's explanation for his indications that her symptoms had improved. *Id.* at 26. She contends that references in the record to periodic, unqualified improvement do not refute Dr. Zeager's general opinion. *Id.* at 27. She maintains that the ALJ provided no explanation for his decision to reject Dr. Zeager's statements regarding the severity of her impairments during the relevant time frame. [ECF No. 10 at 30].

The Commissioner maintains the ALJ thoroughly evaluated Dr. Zeager's opinion and found that it was entitled to some, but not controlling weight because it was inconsistent with his treatment notes. [ECF No. 11 at 8]. She maintains that, although Plaintiff experienced some pain, her pain did not correlate with a finding that she was disabled. *Id.* at 10.

The SSA's regulations require that ALJs accord controlling weight to treating physicians' opinions that are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that are not inconsistent with the other substantial evidence of record. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p. If an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he is required to evaluate all the opinions of record based on the factors in 20 C.F.R. § 404.1527(c). *Id.* Those factors include (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his treatment records; (4) the consistency of the medical

opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. § 404.1527(c).

A treating source's opinion generally carries more weight than any other opinion evidence of record, even if it is not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(c)(2). However, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). Medical opinions that are adequately explained by the medical source and supported by medical signs and laboratory findings should be accorded greater weight than uncorroborated opinions. 20 C.F.R. § 404.1527(c)(3). "[T]he more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it." *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004), citing 20 C.F.R. § 416.927(d) (2004)[6]; *see also* 20 C.F.R. § 404.1427(c)(4).

The ALJ must give good reasons for the weight he accords to the treating source's opinion. SSR 96-2p. The notice of decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*

---

[6] The version of 20 C.F.R. § 416.927 effective March 26, 2012, redesignated 20 C.F.R. § 416.927(d)(4) as 20 C.F.R. § 416.927(c)(4).

The ALJ briefly summarized Dr. Zeager's October 22, 2013 statement. Tr. at 22. He gave some weight to Dr. Zeager's opinion, but found that his statement was "inconsistent with the treatment records that showed improvement in the claimant's impairments with the use of medication and treatment (Exhibits B1F, B7F, and B11F)." Tr. at 24. He determined that Dr. Zeager's statement was "also inconsistent with other medical providers that noted improvement with the use of medication." *Id.* However, he indicated he agreed with Dr. Zeager "regarding the severity level of some of the claimant's impairments but not for the aforementioned time frame[7] and not to the extent that all work would be precluded." *Id.*

The undersigned recommends the court find the ALJ did not adequately consider Dr. Zeager's opinion statements in accordance with the provisions of 20 C.F.R. § 404.1527(c) and SSR 96-2p. As an initial matter, it is unclear from the ALJ's decision whether he considered all of Dr. Zeager's statements or just the October 22, 2013 statement because he failed to reference the medical opinions dated January 11, 2010, and March 4, 2013. Because the regulations require that ALJs address all medical opinions of record, the ALJ erred in failing to consider Dr. Zeager's earlier statements. *See* 20 C.F.R. § 404.1527(b), (c); SSR 96-2p.

The ALJ explained that he discounted Dr. Zeager's opinion based on the supportability and consistency factors in 20 C.F.R. § 404.1527(c)(3) and (4). *See* Tr. at 24. He maintained that he could not give greater weight to Dr. Zeager's opinion because

---

[7] Because the ALJ rendered an unfavorable decision on March 17, 2010, he indicated that "the period at issue in the present case is from March 18, 2010, the alleged onset date to the date last insured of June 30, 2010." Tr. at 14.

it was inconsistent with evidence in the record of improvement with treatment and use of medications. *See id.* However, the ALJ's explanation is insufficient for several reasons.

First, the ALJ failed to reconcile his finding with Dr. Zeager's March 4, 2013 explanation that, despite indications in the record that Plaintiff's pain was well-controlled, she still suffered from significant symptoms of fibromyalgia that would be exacerbated if she were working. Tr. at 281. In *Kellough v. Heckler*, 785 F.2d 1147, 1153 (4th Cir. 1986), the court noted that reference in the record to "[f]eels well" and "normal activity" must be read in context and were "not a substantial basis for rejecting as incredible the claimant's subjective complaints of exertional limitation." The court noted that the physician's notes were "most ambiguous" and that the record contained no explanation from the physician as to the meaning of "feels well" and "normal activity." *Kellough*, 785 F.2d at 1153. The instant case differs from *Kellough* in that Plaintiff's physician provided context for his indications of improvement, but it similarly warrants remand because the ALJ failed to consider the notations of improvement in light of Dr. Zeager's explanation.

Second, the ALJ's decision does not reflect adequate consideration of the treatment relationship between Plaintiff and Dr. Zeager in light of the evidence of record. Pursuant to 20 C.F.R. § 404.1527(c)(2), the ALJ should consider the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship. "Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(i). "Generally, the more

knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(ii). The ALJ referenced Plaintiff's treatment visits with Dr. Zeager on May 18, 2010[8], June 10, 2010, January 14, 2011, March 21, 2013, and May 15, 2013, but he did not acknowledge the frequency of his examinations or the length of their treatment relationship. *See* Tr. at 21–23. The record reflects at least 24 visits between January 2010 and May 2013, but the ALJ's decision does not acknowledge that Plaintiff saw Dr. Zeager as often as twice a month and generally once every two months. *See* Tr. at 201–33, 284–301, 313–19. The ALJ also neglected to consider that Dr. Zeager often referred Plaintiff for diagnostic tests and to specialists, which is relevant to consideration of the nature and extent of the treatment relationship. *See* Tr. at 203 (referred for psychiatric treatment), 285 (carotid and thyroid ultrasounds, comprehensive metabolic panel, and TSH testing), 290 (referred to cardiologist), 297 (lab work regarding lightheadedness, palpitations, fatigue, and other symptoms), 314 (referred to urologist), 318 (referred for evaluation of possible pelvic mass); *see* also 20 C.F.R. § 404.1527(c)(2)(ii). Finally, he neglected to consider the length of the treatment relationship. *See* 20 C.F.R. § 404.1527(c)(2)(i). Dr. Zeager indicated in his March 4, 2013 statement that he had treated Plaintiff since prior to 1999. *See* Tr. at 281. Plaintiff's 14-year (or more) treatment history with Dr. Zeager was relevant to the evaluation of his opinion.

---

[8] The ALJ's decision indicates this visit occurred on March 18, 2010, but a review of the referenced record reveals that the visit actually occurred on May 18, 2010. *Compare* Tr. at 21, *with* Tr. at 223.

Third, the ALJ ignored pertinent evidence in concluding that Dr. Zeager's opinion was contrary to evidence of record that showed improvement in Plaintiff's impairments. "The ALJ is prohibited from cherry picking the evidence, that is, he may consider and discount evidence contrary to his views, or consider it and adopt it, but he cannot simply ignore it and skip over it." *Dutton v. Colvin*, No. 4:13-1888-DCN, 2015 WL 163043, at *14 (D.S.C. Jan. 13, 2015). "The ALJ is obligated to consider all evidence, not just that which is helpful to his decision." *Robinson v. Colvin*, No. 4:13-823-DCN, 2014 WL 4954709, at *13 (D.S.C. Sept. 29, 2014), citing *Gordon v. Schweiker*, 725 F.2d 231 (4th Cir. 1984); *Murphy v. Bowen*, 810 F.2d 433 (4th Cir. 1987). As discussed in the previous paragraph, the record contained 19 treatment visits between January 2010 and May 2013 that the ALJ did not reference in concluding that Dr. Zeager's opinion was refuted by evidence of Plaintiff's improvement. *See* Tr. at 201–33, 284–301, 313–19. Many of those visits reflected Plaintiff's complaints of significant and ongoing impairments and limitations. *See e.g.,* Tr. at 231 (Plaintiff reported syncopal episodes, weakness, and loss of consciousness on January 15, 2013), 233 (Plaintiff complained of worsening myalgia on January 15, 2010), and 225 (Plaintiff reported doing well with her current medication regimen, but requiring six to eight Lortab pills per day to control her pain on March 31, 2010). In addition, the ALJ ignored evidence from the treatment visits he cited that qualified Plaintiff's improvement or showed that she continued to experience significant symptoms. *See* Tr. at  223 (Plaintiff reported stable back pain, but complained of chronic fatigue, cramping in the soles of her feet, and numbness, tingling, and cramping in her legs on March 18, 2010), 219 (Plaintiff indicated she fainted after a coughing spell on

June 10, 2010), 211 (Plaintiff reported syncopal episodes and gradually worsening diffuse myalgia-related pain on January 14, 2011), 318 (Plaintiff indicated her bipolar disorder was generally well-controlled on March 21, 2013, but stated she still experienced approximately two periods of agitation per week that lasted for one to two days at a time; Plaintiff stated her back pain was well-controlled, but that her leg pain was increased; Dr. Zeager observed her to walk with a slow, cautious and stiff gait), and 313 (Plaintiff reported improved fibromyalgia-related pain, but difficulty falling asleep because of lower extremity pain; Dr. Zeager observed her to have a slow, stiff, and cautious gait and edema in her bilateral lower extremities).

In light of the forgoing, the undersigned recommends the court find the ALJ's decision to discount Dr. Zeager's opinion was not supported by substantial evidence.

### b.    Mr. Friddle's Opinion

On August 5, 2013, Mr. Friddle completed an assessment form regarding Plaintiff's mental ability to sustain work-related activities. Tr. at 337–38. He indicated Plaintiff had the following abilities: follow work rules for 80% of an eight-hour workday; relate to coworkers for 60% of an eight-hour workday; deal with the public for 30% of an eight-hour workday; use judgment for 60% of an eight-hour workday; interact with supervisors for 20% of an eight-hour workday; deal with ordinary work stresses for 40% of an eight-hour workday; function independently for 60% of an eight-hour workday; and maintain attention/concentration for 40% of an eight-hour workday. Tr. at 337. Dr. Friddle noted Plaintiff was "still emotionally unstable at times," was "unable to cope w/ normal stress effectively," was "unable to communicate w/ public appropriately," and

experienced "interruption in concentration" as a result of anxiety and mental stress. *Id.* He indicated Plaintiff could understand, remember, and carry out detailed, but not complex, job instructions 60% of the time; could understand, remember, and carry out detailed, but not complex, job instructions 70% of the time; and could understand, remember, and carry out simple job instructions 80% of the time. *Id.* He stated Plaintiff's "concentration may not be adequate to handle a normal work pace due to her level of anxiety." *Id.* Mr. Friddle indicated Plaintiff could maintain her personal appearance 80% of the time; behave in an emotionally stable manner 40% of the time; relate predictably in social situations 40% of the time; and demonstrate reliability 30% of the time. Tr. at 338. He provided "[h]er emotional lability/instability may make it very difficult for her to be punctual and reliable during a 40 hr week." *Id.* Mr. Friddle provided that Plaintiff's limitations had existed at the assessed level of severity "since her first apt on 5/4/11." *Id.*

Plaintiff argues the ALJ erred in giving Mr. Friddle's opinion "no weight" merely because he was not an acceptable medical source. [ECF No. 10 at 32]. She maintains the ALJ did not adequately consider Dr. Friddle's opinion under the provisions of SSR 06-03p. [ECF No. 12 at 9].

The Commissioner maintains that the ALJ was not required to assign any particular weight or to give reasons for assigning no weight to Mr. Friddle's opinion. [ECF No. 11 at 10–11]. She further contends that Mr. Friddle's opinion was irrelevant because it pertained to the period after Plaintiff's DLI. *Id.* at 11.

Because medical opinions may only be rendered by acceptable medical sources, ALJs are not required to explicitly weigh the opinions of other sources based on the

criteria set forth in 20 C.F.R. § 404.1527(c). SSR 06-03p. However, opinions from other medical sources "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* Because the factors set forth in 20 C.F.R. § 404.1527(c) represent basic principles for the consideration of all opinions evidence, they should guide ALJs in considering opinions provided by individuals who do not qualify as acceptable medical sources. *Id.*

"Since there is a requirement to consider all relevant evidence," the ALJ's decision "should reflect the consideration of opinions from medical sources who are not acceptable medical sources." *Id.* The ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.*

The ALJ accorded no weight to Mr. Friddle's opinion because he was "not an acceptable medical source regarding this matter" and his opinion was "irrelevant to this decision." Tr. at 24. The ALJ neglected to explain how Mr. Friddle's opinion was irrelevant to the decision. While the Commissioner submits that Mr. Friddle's opinion was irrelevant because he began treating Plaintiff after her DLI, the undersigned is unpersuaded by this argument because it was not proffered by the ALJ. *See Hall v. Colvin*, No. 8:13-2509-BHH-JDA, 2015 WL 366930, at *11 (D.S.C. Jan. 15, 2015); *Cassidy v. Colvin*, No. 1:13-821-JFA-SVH, 2014 WL 1094379, at *7 n.4 (D.S.C. Mar. 18, 2014), citing *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003)

38

("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). Although the ALJ was not required to explicitly weight Mr. Friddle's opinion based on the criteria in 20 C.F.R. § 404.1527(c), his decision does not suggest that he followed SSR 06-03p's directive to look to the criteria for guidance in considering the "other source" opinion. The ALJ's decision does not consider the substance of Mr. Friddle's opinion and provides no guidance to Plaintiff or the court as to why he gave it no weight, aside from the fact that Mr. Friddle was not an acceptable medical source. Therefore, the undersigned recommends the court find that substantial evidence did not support the ALJ's decision to accord no weight to Mr. Friddle's opinion.

### c.    State Agency Consultants' Opinions

Plaintiff maintains the ALJ erred in giving great weight to the state agency consultants' opinions because they gave no opinions, but instead indicated they had insufficient evidence to evaluate the severity of her impairments. [ECF No. 10 at 34]. She contends the consultants reviewed a record that was significantly incomplete and that the ALJ neglected to provide an explanation for his decision to accept the consultants' opinions over those of the treating physician. *Id.*

The Commissioner argues the ALJ properly gave great weight to the opinions of the state agency consultants because they were consistent with the objective medical evidence. [ECF No. 11 at 11]. She maintains that the state agency consultants reviewed the medical evidence from the relevant period and concluded that there was insufficient evidence to substantiate the presence of a severe mental impairment. *Id.* at 12.

ALJs should evaluate the state agency consultants' opinions as medical opinions of nontreating sources and should explain the weight accorded to their opinions in the decision. SSR 96-6p. "[T]he opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources." *Id.* Thus, they may "be given weight only insofar as they are supported by evidence in the case record . . . ." *Id.* However, "[i]n appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources." *Id.*

The ALJ indicated he gave great weight to the state agency consultants' opinions. Tr. at 24. He acknowledged that the consultants were not treating physicians, but pointed out that they were "medical doctors or trained consultants who reviewed the claimant's medical record prior to rendering their opinions in this matter." *Id.* He determined that "[t]heir overall findings that claimant could perform work were supported by the objective evidence contained in the medical record." *Id.*

Although the ALJ purported to give great weight to the state agency consultants' opinions, his findings are vastly different from theirs. Drs. El-Ibiary and Van Slooten assessed Plaintiff's physical impairments as nonsevere and found no limitations to his residual functional capacity ("RFC"). Tr. at 122–23, 131. Drs. Harkness and Durham determined there was insufficient evidence "to substantiate the presence of a disorder" or to find any restriction to Plaintiff's ADLs, social functioning, and concentration,

persistence, or pace. Tr. at 123, 132. The ALJ's decision to accord great weight to the state agency consultants' opinions is inconsistent with his actual findings regarding Plaintiff's impairments and limitations. *See* Tr. at 16 (finding fibromyalgia, bursitis of the hips, depression, and anxiety to be severe impairments), 18 (assessing mild restriction in ADLs, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence, or pace); and 19 (mentally restricting Plaintiff to simple, routine, and repetitive tasks with no ongoing public contact in a low stress environment and physically restricting her to light work that required no use of ladders, ropes, or scaffolds; only occasion use of ramps and stairs, stooping, balancing, crouching, and crawling; and avoidance of concentrated exposure to hazards, dust, fumes, odors, gases, or pulmonary irritants). The state agency consultants' opinions are refuted by the evidence of record cited by the ALJ in his decision to support the findings he made, as well as the evidence as a whole. *See* Tr. at 16–24; *see also* SSR 96-6p. Because their opinions were generally unsupported, the ALJ erred in giving them greater weight than he gave to the opinions of Plaintiff's treating sources. *See* SSR 96-6p. Therefore, the undersigned recommends the court find that substantial evidence did not support the ALJ's decision to accord great weight to the state agency consultants' opinions.

### 2.     Hypothetical Question Posed to VE

Plaintiff argues the ALJ improperly relied on the VE's response to a hypothetical question that did not precisely set forth all of her impairments and limitations. *Id.* at 35. She maintains that the ALJ found she had a moderate limitation in concentration, persistence, or pace, but failed to include restrictions in the hypothetical to address the

limitation. *Id.* She contends the hypothetical and resultant RFC assessment did not address the record evidence or problems with persistence and pace. *Id.* at 35–36; ECF No. 12 at 14.

The Commissioner argues the ALJ's RFC determination accurately accounted for all of Plaintiff's work-related functional limitations. [ECF No. 11 at 14]. She maintains the ALJ considered Plaintiff's moderate limitation in concentration, persistence, or pace by limiting her to simple, routine, repetitive tasks that involved no ongoing public contact and that were low stress (defined as involving only occasional changes in the work setting or decision making). *Id.* at 15.

At step five of the sequential evaluation process, the Commissioner bears the burden of showing that the economy contains a significant number of jobs that the claimant can perform. *Walls*, 296 F.3d at 290. ALJs obtain testimony from VEs to meet this burden. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted). For the VE's opinion to be relevant, "it must be based upon a consideration of all other evidence in the record . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Johnson*, 434 F.3d at 659 (quoting *Walker*, 889 F.2d at 50); *see also English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993). ALJs have discretion in framing hypothetical questions, but the limitations included in the hypothetical questions must be supported by the record. *See Swaim v. Califano*, 599 F.2d 1309, 1312 (4th Cir. 1979). A VE's testimony cannot constitute substantial evidence in support of the Commissioner's decision if the hypothesis fails to conform to the facts. *See id.*

In *Mascio v. Colvin*, 780 F.3d 632, 637–38 (2015), the Fourth Circuit found that the ALJ erred in assessing the plaintiff's RFC based on an incomplete hypothetical to the VE. Although the ALJ assessed adjustment disorder as a severe impairment, he included no mental limitations in the hypothetical question to the VE. *Mascio*, 780 F.3d at 637. The court stated that the ALJ's finding that the plaintiff was limited to unskilled work was based on the VE's "unsolicited addition of 'unskilled work'" in response to the ALJ's hypothetical. *Id.* at 637–38. As Plaintiff points out, the *Mascio* decision states "we agree with other circuits that an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" *Id.* at 638. The court recognized a distinction between the ability to perform simple tasks and the ability to stay on task and noted that only the ability to stay on task pertained to a limitation in concentration, persistence, or pace. *Id.* It recognized that "the ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work," but determined remand was necessary because the ALJ failed to explain how he accounted for Plaintiff's moderate limitation in concentration, persistence, or pace in the assessed RFC. *Id.*

This court has considered the implications of the Fourth Circuit's holding in *Mascio* in several recent cases. The court has consistently held that an ALJ accounts for moderate limitations in concentration, persistence, or pace by explaining how this functional limitation was considered as part of the RFC assessment. *See Davis v. Colvin*, No. 0:14-4314-TMC-PJG, 2015 WL 7871172, at *4 (D.S.C. Dec. 4, 2015) ("As discussed above and contrary to the *Mascio* case, the ALJ accounted for Davis's

limitations and credibility in determining her RFC prior to proceeding to steps four and five. Further, the ALJ found that any limitation in Davis's concentration, persistence, or pace did not affect her ability to perform simple, routine, repetitive tasks."); *Falls v. Colvin*, No. 8:14-195-RBH, 2015 WL 5797751, at *7 (D.S.C. Sept. 29, 2015) ("As opposed to the hypothetical in *Mascio*, which said nothing about the claimant's mental limitations, the ALJ's hypothetical in this case accounted for each of Plaintiff's mental limitations. The ALJ also accounted for Plaintiff's limitations in the area of concentration when determining Plaintiff's RFC. The ALJ noted Plaintiff's mental limitations but found that the Plaintiff could 'concentrate, persist and work at pace to do simple, routine, repetitive work at 1–2 step instructions for extended periods say 2-hour periods in an 8-hour day.'"); *Gilbert v. Colvin*, No. 2:14-981-MGL-MGB, 2015 WL 5009225, at *14 (D.S.C. Aug. 19, 2015) ("In *Mascio*, the ALJ concluded the plaintiff had a moderate limitation in concentration, persistence, or pace but did not include any corresponding limitation in the plaintiff's RFC, nor did the ALJ explain the reasons for not including such a limitation. In the case *sub judice*, however, the ALJ limited Plaintiff to 'simple work,' specifically relying on Dr. Boland's assessment that despite Plaintiff's 'difficulty sustaining her concentration and pace on complex tasks,' Plaintiff 'should be able to . . . perform simple tasks without special supervision.'").

Here, the ALJ determined Plaintiff had moderate difficulties in concentration, persistence, or pace based on her ability to follow some television programs and complete some household tasks at a slow pace. Tr. at 18. In discussing the effects of Plaintiff's depression and anxiety, the ALJ found that Plaintiff reported improved mood and sleep

while taking Seroquel, less irritability and agitation while taking Ativan, no interaction problems with family, and an ability to perform a limited number of household tasks without restriction. Tr. at 23–24. He included in the assessed RFC a limitation to simple, routine, and repetitive tasks that required no ongoing public contact and that were low stress, which he defined as requiring only occasional change in work setting or decision making. Tr. at 19. The assessed RFC included the same limitations the ALJ included in the first hypothetical question to the VE. *Compare* Tr. at 19, *with* Tr. at 62–63. The ALJ relied on the VE's testimony that an individual with the specified limitations could perform jobs as an assembler, a hand packager, a general products tester, and a machine operator. Tr. at 26.

The ALJ's hypothetical question and assessed RFC in this case differ from those in *Mascio*. Here, the ALJ included specific mental limitations in the hypothetical question to the VE and based his determination that Plaintiff could perform jobs on the VE's response to the hypothetical question. *See* Tr. at 19, 62–63. Nevertheless, the ALJ did not explain why he found Plaintiff to be limited as indicated in the RFC assessment or how he accounted for Plaintiff's moderate limitations in concentration, persistence, or pace. He specifically indicated that he considered Plaintiff's inability to follow some television programs and her slow pace in completing household tasks in finding that she had moderate limitations in concentration, persistence, or pace, but he assessed no particular limitations that were directly related to concentration, persistence, or pace. *Compare* Tr. at 18, *with* Tr. at 19. Because the ALJ credited Plaintiff's allegations of difficulty staying on task and performing activities at a normal pace, he should have either included in the

RFC assessment limitations related to Plaintiff's abilities to stay on task and maintain pace or explained how the RFC he assessed accommodated Plaintiff's moderate limitations in concentration, persistence, or pace. He did neither, and his hypothetical question to the VE and ultimate RFC finding failed to accommodate Plaintiff's impairments and limitations. Therefore, the undersigned recommends the court find the ALJ erred in relying on the VE's testimony to find that Plaintiff was capable of performing a significant number of jobs in the economy.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

May 6, 2016                                    Shiva V. Hodges
Columbia, South Carolina                       United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).